STATE OF IOWA, Appellee, v. EDITH HESTER et al., Appellants.

APRIL 3, 1928.

*H. L. Robertson* and *William P. Welch,* for appellants.

*John Fletcher,* Attorney-general, and *Roy Havens,* County Attorney, for appellee.

WAGNER, J.—The appellants are two sisters and a brother. At the time of the larceny, the defendants were aged, respectively, Edith Hester, 16, Darrell Hester, 21, and Bernice Peterson, 25.  Bernice Peterson was divorced from her husband, and the three children lived with their mother, four miles northwest of Modale. After the time of the commission of the crime, Bernice Peterson married a man by the name of McKay. The three children and William Hillman were jointly indicted for the larceny of chickens from a coop, which larceny occurred on the evening of June 5, 1926. The three appellants had a joint

trial, were each found guilty, and the court pronounced judgment upon Bernice Peterson McKay of confinement in the women's reformatory at Rockwell City for a period not exceeding two years. The judgment upon Darrell Hester was that he be confined in the reformatory at Anamosa, for a period not exceeding two years; and as to Edith Hester, the cause was transferred to the juvenile court, and she was ordered confined in the girls' industrial school at Mitchellville until she attain the age of 21 years, unless sooner legally discharged.

At the close of the State's evidence, the defendants made a motion for directed verdict, which was renewed at the close of all the evidence, which motions were by the court overruled.

Only two questions are presented on this appeal: First, the sufficiency of the evidence to warrant a conviction, and second, the claim of the appellants that the punishment is excessive.

The Parker family consists of Mr. and Mrs. Parker and their daughter, Marjorie, eight years of age. On the evening of June 5, 1926, the Parker family was absent from home until midnight or later. Mrs. Parker was the owner of 96 chickens about a month old, and all except approximately a half dozen of same were of the Buff Orpington breed, the remainder being mixed. These chickens, together with ducks, had at times been fed buttermilk, and the Parkers testified that during the evening they had fed them buttermilk, which was spattered by the ducks and otherwise over the chickens, and that the buttermilk, with the dust settling thereon, had dried on the chickens, until in this manner they were quite distinguishable. At the time of the Parkers' departure from the home, these 96 chickens were left in a box on the front porch. The yard was inclosed by a fence, and the front gate closed. At the time of their return that night, the front gate was open, and the box and chickens therein were gone.

The Parker home is situated in the northwest corner of two crossroads, and three miles directly west of the town of Modale. The Hester home, four miles northwest of Modale, is situated one mile north, one mile east, and then one mile north of the Parker home. The direct route from the Hester home to Modale is to travel one mile south therefrom, then one mile east, then one mile south, and one mile east into Modale. There is no dispute that the three defendants and Hillman were at Modale

sometime before midnight of June 5th. They were traveling in an old rickety buggy, to which were hitched a mule and a horse, one of the parties riding another horse. The three defendants testified that they left the Hester home between 8 and 9 o'clock, and went the direct route, hereinbefore mentioned, to Modale, arriving there between 9 and 10 o'clock.

The Parkers arose early on the morning of June 6th, and in going to the road in front of the house, ascertained tracks of a buggy, and apparently those of a mule and a horse, which came from the north and went in an easterly direction toward Modale. They also observed, in various portions of the highway, tracks apparently of another horse, coming from the same direction, and apparently bound for the same destination. They got in their car and pursued the backward course of the tracks to the Hester home. After obtaining a search warrant, the three Parkers and two others, including the marshal of Modale, appeared at the Hester home, and there, in a shed, they found 92 young living chickens penned up in the corner. There were four dead chickens lying in close proximity, making the 96 which the Parkers claimed. The Parkers swore positively to the identity of said chickens, by reason of their general appearance, which answered the description of their chickens, and especially by reason of the marks thereon from the feeding of the buttermilk hereinbefore mentioned. The little girl was positive in her identification of some of the chickens, which she called her "pets."

A neighbor living one mile north of the Parker home testified that he saw such an outfit as was driven by the Hesters and Hillman pass his house in the direction of the Parker home about 9:30 in the evening, and that he recognized the voice of one of the crew as being that of the defendant Darrell Hester.

Another witness testified that, about 10:30 that night, he saw the defendants about 40 rods east of the Parker place,— Hillman riding a horse, the girls in the front part of the buggy, and a boy in the back part, sitting on a kind of a box.

Another witness testified that, about 10:40 P. M., he saw the defendants and Bill Hillman in the road at the corner one mile west from Modale, not traveling, but standing there in the road; that he flashed his light upon them and recognized them; that the three defendants were in the buggy, and Hillman be-

hind the buggy, standing by the gray horse; that he did not see anything other than the defendants in the buggy, at that time; that there is a cornfield west of the road. This corner is on the direct route from Modale to the Hester home.

The marshal of Modale testified that, on the morning of June 6th, he followed the tracks from the Hester place down to the Parker place, and from there to Modale, and back to the Hester place; that one wheel on the left-hand side wabbled quite a little; that from Modale they went west, then north, then west, and then straight north to the Hester place.

The defendants testified that, on their return from Modale, they did not go the same route which they claim to have traveled in going from the Hester home to Modale, but took a different route, past the home of the father-in-law of their brother, to see if the brother was there. But finding that his car was not at the home of the father-in-law, they went on, coming into the Hester home from the north, instead of the south.

The defendants left Modale about 12:30 A. M., arriving home about an hour later. The marshal of Modale testified that he saw them in Modale, but did not know when it was, but it was after he rang the curfew at 9 o'clock. Other witnesses testified that they saw them in Modale at a late hour,—from 11:30 to 12:30 o'clock.

In the shed where the chickens hereinbefore mentioned were found, were others, some much younger, and of various colors. It is claimed by the defendants that the chickens in question belonged to their mother, and the mother so claimed on the morning of June 6th. The mother was not used as a witness at the trial. The defendants assert that their mother, at the time in question, had 150 to 160 little chickens, and only 50 or 60 of them were Buff Orpingtons, and the remainder white and mixed. They testified that they first bought from a Mrs. Stansberry two settings of eggs, fifteen in each setting, for $1.00, and that the defendant Edith Hester helped her in setting out strawberries for the next two settings. Mrs. Stansberry testified that, sometime in May, Edith helped her with the strawberries, and she gave her, by way of remuneration, 30 Buff Orpington eggs; that she has no recollection of the Hesters'

getting any other eggs from her that spring; that she does not remember selling them two other settings at 50 cents each.

Mrs. Parker testified that she believes there were a few Buff Orpington chickens (other than what she took away) in the yard at the Hester place, but that they did not have anything (marks of buttermilk) on their feathers. By way of explanation of the marks upon the chickens, Bernice Peterson McKay testified that she had fed the chickens oatmeal, gravy, and stuff from the table, the evening of June 5th.

There is other testimony of very slight importance, but the foregoing constitutes the material portions of the testimony as disclosed by the record. The evidence is necessarily circumstantial in its character. No complaint is made as to the instructions given by the court; the complaint is that the evidence is not sufficient to warrant a verdict of guilty. We are of the contrary opinion. The court correctly instructed the jury upon the subject of circumstantial evidence; the evidence creates more than a mere suspicion against the defendants. Under our statutory law, all persons concerned in the commission of a public offense, whether they directly commit the act constituting the offense, or aid and abet its commission, are punishable as principals. Section 12895, Code of 1924.. The court correctly instructed the jury as to this matter, and no complaint is made as to the instructions.

"Whatever connection a defendant has in the commission of a crime, may be established by circumstantial evidence." *State v. Carlson,* 203 Iowa 90.

In *State v. Alley,* 149 Iowa 196 (a case of larceny of chickens), we said:

"While the testimony relied upon to sustain the conviction was purely circumstantial, we cannot say that it was insufficient to sustain the charge. Crimes of that nature are not often established by direct and positive evidence, and the State is usually compelled to rely upon collateral facts and circumstances to make its case. If these are of such character as to convince the jury beyond a reasonable doubt of the truth of the charge, no more is required to sustain the verdict."

It is not our province to determine whether, on the testimony of the witnesses as embodied in the record, we should have been satisfied to find that the defendants were guilty, beyond a

reasonable.doubt. The determination of that question was for the jurors, who heard the testimony of the witnesses and observed their conduct at the trial. It is conclusively established that the Parker chickens were stolen by someone; there is evidence that the defendants were in the vicinity of the Parker home at the time in question, going two miles out of their way in order to get there; the identification of the chickens found at the Hester home by the three Parkers is positive, and they have reasonable grounds upon which to base the identification. When we take these facts, and all of the other facts and circumstances as shown by the record, it is sufficient to support the verdict.

The sole remaining question is as to whether or not the punishment is excessive. It must be borne in mind that the prosecution is under Section 13015, Code of 1924, and that the maximum sentence under said section is that given by the trial court. Since the time of the commission of this crime, the legislature has increased the maximum punishment to a term in the penitentiary for a period not more than five years.. See Section 13015, Code of 1927.

In view of the frequency with which the larceny of chickens is committed, and in view of the fact that the legislative branch of our state government has seen fit to recently increase the punishment which may be inflicted, we do not feel justified in reducing the punishment, under the provisions of Section 14010 of the Code.

We find no error in the record, and the judgment of the trial court is hereby affirmed.—*Affirmed.*

All the justices concur.